UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SAMANTHA STECKLOFF,                          Case No. 18-13230

     Plaintiff                              Stephanie Dawkins Davis
v.                                           United States District Judge

WAYNE STATE UNIVERSITY,

     Defendant.

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT (ECF No. 32)**

## I.    PROCEDURAL HISTORY

Plaintiff, Samantha Steckloff, brought her disability discrimination claims

against defendant, Wayne State University (WSU) in state court on October 2,

2018.  (ECF No. 1-1).  WSU removed this matter to federal court on October 16,

2018, based on Steckloff's claim under § 504 of the Rehabilitation Act, 19 U.S.C.

§ 794(a), *et seq*.  (ECF No. 1).  Steckloff also brings claims under the Michigan

Persons with Disability Civil Rights Act (PWDCRA), Mich. Comp. Laws

§ 37.1101, *et seq*.  (ECF No. 1-1).  WSU filed its motion for summary judgment on

January 20, 2020.  (ECF No. 32).  Steckloff filed her response on February 10,

2020 and WSU filed its reply on February 24, 2020.  (ECF Nos. 33, 34).  Pursuant

to notice, the Court held a hearing via video on April 16, 2020.  (*See* Text Only

Notice of Video Hearing dated 4/14/20).  For the reasons set forth below, the court
**GRANTS** defendant's motion for summary judgment.

## II.    FACTUAL BACKGROUND

Steckloff is a former employee of WSU.  She was initially hired in August
2011 to work in the Student Service Center.  In that position, Steckloff was
represented by a union.  (ECF No. 33-1, Steckloff dep, pp. 32, 34).  In 2013, WSU
created and posted a new Enrollment Management Coordinator ("EMC") position
in the Office of Undergraduate Admissions and Orientation.  (ECF No. 33-1,
Steckloff dep, p. 35).  Steckloff was ultimately offered and accepted the position,
effective September 9, 2013.  The EMC position was a non-union position, and
Steckloff was the only person in that position.  Her regular hours of work were
8:30 a.m. to 5:00 p.m., Monday through Friday.  (ECF No. 32-5, 8/28/2013 offer
letter, Ex. D; ECF No. 33-1, Steckloff dep, pp. 37-38, 75, 85).  According to the
job description and Steckloff's testimony, the essential job duties of the EMC
position required her to be physically present on campus and routinely interact
face-to-face with students.  These duties included, among others, attending open
house events, admitted student days, and student orientations.  Additionally,
Steckloff supervised the student employee campus tour guides, and also personally
conducted some of the campus tours herself.  Campus tours, sometimes two per
day, took place almost every day.  (ECF No. 33-1, Steckloff dep, pp. 42-46, 50;

ECF No. 32-8, Ex. G; ECF No. 32-6, Brown dep, p. 33). LaJoyce Brown was the interim Director of Undergraduate Admissions and New Student Orientation from July 2013 to February 2016 and was Steckloff's initial EMC supervisor. Ericka Jackson became Director of Undergraduate Admissions and Steckloff's immediate supervisor in February 2016, and for the remainder of her employment. (ECF No. 32-6, Brown dep, p. 6; ECF No. 32-7, Jackson dep, pp. 7-9).

In 2015, Steckloff was diagnosed with breast cancer and began to struggle with health problems. (ECF No. 33-1, Steckloff dep, pp. 26-27). Steckloff underwent a double mastectomy with approved FMLA paperwork, which stated that she would be absent for four weeks to recover. In Steckloff's view, after her return to work after surgery, WSU provided two reasonable, effective accommodations. First, WSU allowed Steckloff to use a special call-in procedure when she was unable to come into work due to her disability. (ECF No. 33-3, Ex. 3, May 13, 2015 Memorandum). Steckloff was permitted to communicate her medically necessary days off on short notice either 1) in person; 2) through email; or 3) text. Second, Steckloff was permitted to use old sick bank hours[1] when she was required to miss work due to medical necessity. (ECF No. 33-1, Steckloff dep, pp. 143-144). This arrangement allowed Steckloff to miss work when

---

[1] The "old sick bank" includes sick time accrued from Steckloff's prior union position with WSU, before becoming the Enrollment Management Coordinator. (ECF No. 32-3, PageID.421, Ex. B, Affidavit of Anna Marie Robinson).

medically necessary without being docked pay.  Before 2017, Steckloff says she was afforded these accommodations with no issues.

However, starting in 2017, WSU rescinded Steckloff's accommodations and began deducting pay for utilizing her sick bank hours.  (ECF No. 33-1, Steckloff dep, p. 140).  Human resources explained that she would no longer receive pay for using her "sick bank hours."  *Id*. at 143.  This reduced her salary by the number of "sick bank hours" used to cover her absences from work.  *Id.* at 146.  Moreover, Steckloff says that her days off were suddenly considered "unexcused absences," rather than sick time, as WSU had previously characterized them.  Steckloff maintains that Lynn Anglebradt, of human resources, unilaterally attempted to dock Steckloff's pay and place unexcused absences in her file.  (ECF No. 33-6, Ex. 6, HR emails; ECF No. 33-5, Ex. 5, Jackson dep).

According to WSU, Steckloff's hundreds of hours of non-FMLA unscheduled absences and tardiness led to her termination.  For example, for the one year period 4/24/2016 to 4/24/2017, Steckloff had 24 absence "occasions" and 341.6 hours of unexcused unscheduled absence.  (ECF No. 32-11, Ex. J).[2]  After returning from an FMLA leave, Steckloff's doctor cleared her to work full time

---

[2] An "occasion" is defined as an absence of 3.8 hours or more per 7.5 hour work-day. Excessive absenteeism occurs when an employee has 1) more than 6 occasions of unscheduled absence in a 12-month rolling year or 2) unscheduled absence(s) in excess of 45 hours, involving four or more occasions in a 12-month rolling year.  Excessive tardiness means incurring more than six incidents of unscheduled tardiness in a 12-month rolling year.  (Dkt. 32-2, Ex. A, WSU Attendance Policy).

without restrictions or accommodations on March 28, 2017.  (ECF No. 32-12, Ex. K).  Steckloff's unscheduled absences and tardies continued.  She had unscheduled absences on 3/30/17, 4/4/17 and 4/13/17, and was late or left early on 3/31/17, 4/10/17, 4/14/17, 4/19/17, 4/20/17 and 4/24/17.  (ECF No. 32-11, Ex. J).  Steckloff admits that she was absent on each of the indicated dates and does not dispute that she arrived late or left early on each of the other dates so indicated.  (ECF No. 33-1, Steckloff dep, pp. 156-157).

From 4/24/2016 to 4/24/2017, Steckloff accumulated more than 341 hours of unexcused, unscheduled absences, and 24 attendance "occasions."  Although Steckloff had accrued over three times the number of occasions that would warrant discipline or termination under the Attendance Policy, rather than terminating her, WSU issued Steckloff a memo placing her on "medical verification status."  (ECF No. 32-11, Ex. J).  As the memo indicates, being placed on "medical verification status" was not itself disciplinary.  Its purpose was to put Steckloff on notice of the seriousness of her ongoing attendance issues and that continuing attendance issues could result in termination.  (ECF No. 32-7, Jackson dep, p. 48).  WSU says that other employees with attendance issues have also been placed on medical verification status.  (ECF No. 32-9, Ex. H).

WSU also gave Steckloff a separate April 28, 2017 memo regarding proper methods to communicate time off requests.  (ECF No. 32-18, Ex. Q).  The memo

indicated that Steckloff had texted Jackson on April 4, 2017 that she would be late, but then with no further communication had failed to show up for work at all.  The memo informed Steckloff that texting was not one of the approved methods of communication regarding time off.  The memo also stated that it was Steckloff's "final notice" and that failure to follow the proper notification procedure could result in termination.  Steckloff, nevertheless, continued to communicate via text regarding time off, but apparently was not disciplined.

On Friday, June 2, 2017, Steckloff emailed Jackson asking to leave early on Monday June 5.  (ECF No. 32-19, Ex. R).  The request was for a non-medical reason, to attend a fundraiser for her City Council re-election bid, and Steckloff admits that the request was last minute.  (ECF No. 33-1, Steckloff dep, p. 180).  Although other requests for time off to attend city events were granted, Jackson responded indicating that she could not approve this request to leave early because approval of such requests was based on work needs and a work project had not been completed.  Nonetheless, Steckloff admits that she did leave early on June 5, although she maintains that she only left five minutes early.  (ECF No. 33-1, Steckloff dep, p. 181).  On June 8, 2017, Steckloff was issued a memo for insubordination because she left work early despite her supervisor having denied that request.  (ECF No. 32-20, Ex. S).  WSU reminded Steckloff of the requirement

that she follow proper procedures and that further misconduct could result in termination.  *Id.*

WSU sent Steckloff a separate memo on June 8, 2017 for continuing unauthorized and excessive absenteeism.  (ECF No. 32-21, Ex. T).  The memo identifies seven specific days of additional unscheduled absences after Steckloff was placed on medical verification status.  Steckloff does not dispute that she was in fact absent on each of the seven additional days identified in the June 8, 2017 memo.  (ECF No. 33-1, Steckloff dep, p. 194).  WSU warned Steckloff that "[i]f your pattern of excessive absenteeism and unauthorized time off continues, it may result in termination of employment."  (ECF No. 32-21, Ex. T).  Steckloff filed a complaint with the Equal Employment Opportunity Commission (EEOC) on June 29, 2017, alleging disability discrimination.  (ECF No. 33-8, Ex. 8, EEOC Complaint).

WSU repeatedly informed Steckloff that if she needed additional time off, even when her FMLA had been exhausted and despite her having accrued occasions in excess of the amount needed to support termination under the Attendance Policy, she could request it as a disability accommodation through WSU's Office of Equal Opportunity (OEO).  It is undisputed that Steckloff was so informed verbally.  (ECF No. 33-1, Steckloff dep, pp. 188-189).  Jackson testified that she and HR met twice with Steckloff and informed her of that option.  (ECF

No. 32-7, Jackson dep, p. 60).  WSU also informed Steckloff four separate times, in writing.  (ECF Nos. 32-21, 32-22, 32-23, 32-25, Exhibits T, U, V, X).  Yet, Steckloff never contacted OEO to request any accommodation.  (ECF No. 33-1, Steckloff dep, p. 155).

After the June 2017 memo, Steckloff's unscheduled absences and tardies continued.  (ECF No. 32-26, Ex. Y, showing absences, tardiness or leaving early on 6/30/17, 7/6/17, 7/11/17, 7/17/17, and 7/12/17).  Then, on September 19, 2017, Steckloff texted Jackson that she needed to come in late because she was experiencing pain.  The next day, September 20, 2017, Steckloff again texted Jackson that she would be late because of physical issues.  On September 22, 2017, Steckloff texted Jackson at 9:15 a.m. saying that her alarm did not go off but she was now rushing to get in.  (ECF No. 32-27, Ex. Z).

Monday September 25, 2017, Steckloff texted Jackson, at 7:14 a.m. to say she would be late because of pain but would be in to attend a planned meeting.  At 8:48 a.m. that day she texted again saying that she could not really move but was "shooting for 11."  At 9:49 a.m. she texted again saying that because of continuing pain she would be in later in the day.  At 12:17 p.m. she texted saying she was on her way in.  (ECF No. 32-29, Ex. BB).  The following day, Tuesday September 26, 2017, Steckloff texted saying she was waiting for a prescription and might be 15

minutes late.  Two days later, on September 28, 2017, she texted saying that she was in pain but would try to make it in in a few hours.  (ECF No. 32-29, Ex. BB). On October 2, 2017, Steckloff texted saying that she was taking an "AP" day (any purpose day, essentially a personal day) for "another dental emergency" and that she understood that would mean she would miss a scheduled meeting.  The next day, October 3, 2017, she texted saying that because of mouth pain and medication she would probably be in at 9:00, then texted saying 10:30, then texted saying she was "going with 11," then finally texted asking if she could use another AP day because they pulled a wisdom tooth which she did not realize they were going to do.  (ECF No. 32-31, Ex. DD, texts, and email indicating a wisdom tooth was pulled).

WSU informed Steckloff that her FMLA time would be exhausted after one hour on August 22, 2017.  But according to the Web Time entries Steckloff submitted for the one month period of 8/22 to 9/22/2017, after her FMLA exhausted, she took at least 89 hours of unscheduled time off.  (ECF No. 32-3, attachment 2 to Robinson affidavit).  According to WSU, Steckloff did not account for any time after September 22, 2017, either electronic or by paper.  *Id*.  Her text messages and e-mails show that during the period after September 22, 2017, Steckloff also took at least an additional 22.75 hours of unscheduled time off, possibly more.  Specifically: 9/25 (at least 4 hour); 9/26 (at least .25 hours); 9/28

(at least 3 hours); 9/29 (left early at least .5 hours); 10/2 (7.5 hours); 10/3 (7.5 hours).  (ECF Nos. 32-29, 32-31, Ex. BB and DD).  Thus, in the six week period after her FMLA expired, i.e. 8/22/2017 to 10/3/2017, Steckloff took at least 111.75 additional hours of unscheduled time off, without having sought an accommodation for additional time off.  *Id.*

According to WSU, Steckloff also engaged in additional attendance violations when she repeatedly failed to appropriately report time off.  For example, she submitted a large group of late paper time sheets on or around September 9, 2017, accounting for 179.5 hours of time that she had missed from 3/2/2017 to 6/2/2017 and had failed to timely report.  (ECF No. 32-32, Ex. EE).  According to WSU, if Steckloff had timely reported this time off, her old sick bank would have been significantly in deficit prior to September 19, 2017.  *Id.*[3]

Ericka Jackson, Dawn Medley and Lynn Anglebrandt from HR consulted and agreed that they had no option but to terminate Steckloff's employment.  On October 4, 2017, WSU terminated Steckloff's employment for excessive absenteeism and tardiness, in violation of the university's Attendance Policy.  (ECF No. 32-33, Ex. FF, 10/4/2017 letter).  Absences or tardiness that were part of

---

[3] At the time Steckloff was terminated, she had only 5.72 hours of sick time remaining, based on the time she had reported through September 22, 2017.  (ECF No. 32-3, Ex. B, ¶ 5, attachment 1).  Unreported missed work hours would not have been taken into account when calculating the 5.72 hours shown on attachment 1.  (ECF No. 32-3, Ex. B, ¶ 7).  Accordingly, the 179.5 hours of missed time that Steckloff submitted in September were not accounted for in attachment 1, leaving Steckloff's old sick bank in deficit.  (ECF No. 32-32, Ex. EE).

an approved FMLA leave were not considered unscheduled "occasions" under

WSU's Attendance Policy, and therefore were not considered for purposes of

placement on medical verification status, or for purposes of her termination.  (ECF

No. 32-9, 32-10, 32-3, Medley, Anglebrandt and Robinson affidavits, Exs. H, I and

B; ECF No. 32-7, Jackson dep, p. 39).

## III.   ANALYSIS AND CONCLUSIONS

### A.   Standard of Review

When a party files a motion for summary judgment, it must be granted "if

the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  "A party

asserting that a fact cannot be or is genuinely disputed must support the assertion

by: (A) citing to particular parts of materials in the record...; or (B) showing that

the materials cited do not establish the absence or presence of a genuine dispute, or

that an adverse party cannot produce admissible evidence to support the fact."

Fed.R.Civ.P. 56(c)(1).  The standard for determining whether summary judgment

is appropriate is "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law."  *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d

433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

251-52 (1986)).  Furthermore, the evidence and all reasonable inferences must be

construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" *Brown v. Scott*, 329 F.Supp.2d 905, 910 (6th Cir. 2004). In order to fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

The Court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Such a determination requires that the Court "view the evidence presented through

the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254. Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of the evidence, on a motion for summary judgment the Court must determine whether a jury could reasonably find that the plaintiff's factual contentions are true by a preponderance of the evidence. *See id.* at 252-53. Finally, if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323. The Court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those "opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id*. at 327.

    B.   <u>Disability Discrimination Claims</u>

Steckloff brings disability discrimination claims under the Rehabilitation Act and the PWDCRA, alleging disparate treatment. (ECF No. 1-1, Counts I and II). She also brings a second disability discrimination claim under the PWDCRA only, alleging a failure to accommodate her disability. (ECF No. 1-1, Count IV).

To prevail on a claim for discrimination under the Rehabilitation Act,[4] a plaintiff must show that she: (1) is disabled, (2) is otherwise qualified to perform the essential functions of the position, with or without reasonable accommodation, and (3) suffered an adverse employment action solely because of his disability. *Mitchell v. United States Postal Service*, 738 Fed. Appx. 838, 843 (6th Cir. 2018) (citing *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007)).  A prima facie case of discrimination under the PWDCRA[5] is established where (1) the plaintiff is "disabled" as defined in the statute, (2) the disability is unrelated to the plaintiff's ability to perform the duties of a particular job or position or is unrelated to the plaintiff's qualifications for employment or promotion, and (3) the plaintiff has been discriminated against in one of the ways set forth in the statute. *Lowe v. City*

---

[4] "[E]mployment discrimination complaints under the Rehabilitation Act are governed by the standards of the Americans with Disabilities Act of 1990 (ADA)...." *Spence v. Donahoe*, 515 Fed. Appx. 561, 568 (6th Cir. 2013) (citing *Lee v. City of Columbus*, 636 F.3d 245, 250 (6th Cir. 2011); 29 U.S.C. § 794(d)).  Accordingly, "cases construing one statute are instructive in construing the other." *Andrews v. Ohio*, 104 F.3d 803, 807 (6th Cir. 1997).

[5] The PWDCRA and ADA have similar purposes and share some definitions.  Michigan courts have thus looked to ADA cases for guidance. *Stevens v. Inland Waters, Inc*, 220 Mich. App 212, 216-217 (1996).  When interpreting provisions of the PWDCRA, the analogous federal precedents are persuasive, but not binding. *Noe v. Dep't of Treasury*, 2019 WL 452164, at *5 (Mich. App. Feb. 5, 2019) (citing *Chmielewski v. Xermac, Inc*., 457 Mich. 593, 601-602 (1998)).  While the ADA and the PWDCRA share the same purpose and use similar definitions and analysis, they are not identical. *Noe*, at *5 (citing *Peden v. City of Detroit*, 470 Mich. 195, 217 (2004)).  Although Michigan courts may look to the ADA, and federal cases interpreting the ADA, for guidance when interpreting the PWDCRA, Michigan courts are not bound to follow federal precedent in analyzing the PWDCRA. *Id*.  Notably, the Michigan Supreme Court has cautioned against simply assuming that the PWDCRA analysis will automatically parallel analysis under the ADA. *Id*.

*of* Portage, 2003 WL 33017804 (Mich. App. 2003) (citing Mich. Comp. Laws § 37.1202(1); *Petzold v. Borman's, Inc*, 241 Mich. App. 707, 714 (2000)).

   1.  Qualified Person with a Disability.

  WSU argues that Steckloff is not a qualified person with a disability because she could not perform the essential functions of her job with or without reasonable accommodation.  More specifically, WSU maintains that "regular and predictable" attendance, which can include on-site attendance, is an essential job function. *EEOC v. Ford Motor Company*, 782 F.3d 753, 761 (6th Cir. 2015).  WSU argues that Steckloff's position required regular attendance on campus for various campus functions, supervising students who conducted near-daily tours, and conducting some tours herself.  According to WSU, excluding FMLA time, Steckloff continued to have significantly more unscheduled "occasions" than were permitted by WSU's Attendance Policy.  (*See* ECF No. 32-11, Ex. J, 341.6 hours and 24 occasions of unexcused unscheduled absences from 4/24/2016 – 4/24/17; *see also* ECF Nos. 32-26, 32-27, 32-29, 32-32, 32-32).  In response, Steckloff argues that she is able to perform the essential functions of her employment with a reasonable accommodation because she had done so for several years.  WSU has allowed her to use her old sick bank time to make up time missed due to her disability and continuing such an accommodation would allow her to perform the essential functions of her job.  (*See* ECF No. 33-5, Ex. 5, Jackson dep, p. 33).

The second element of a discrimination claim under the Rehabilitation Act and the PWDCRA are similar.  Importantly, a prima facie case of discrimination under the PWDCRA requires a plaintiff to show that her disability is *unrelated* to her ability to perform her duties.  Under the PWDCRA, the phrase "unrelated to the individual's ability" means that "with or without accommodation, an individual's disability does not prevent the individual from performing the duties of a particular job or position."  Mich. Comp. Laws § 37.1103(1).  The phrase "with or without accommodation" guarantees that an individual otherwise qualified for a particular job or position is entitled to some accommodation if needed. *Cunningham v. USF Holland, Inc.*, 2013 WL 1748563, at *5 (Mich. Ct. App. Apr. 23, 2013).  However, the PWDCRA does not require an employer to modify primary duties as an accommodation, nor is an employer required to transfer an employee to another position.  Mich. Comp. Laws § 37.1210(15); *Rourk v. Oakwood Hosp Corp*, 458 Mich. 25, 31 (1998).  As explained in *Rourk*, the PWDCRA specifically identifies the following types of accommodation:  "(1) purchasing equipment and devices, (2) reasonable routine maintenance or repair of such equipment and devices, (3) hiring readers and interpreters, and (4) restructuring jobs and altering schedules for minor and infrequent duties." *Rourk* recognized that these accommodations were not an "exhaustive list" of

accommodations but provided guidance as to the types of accommodations the Legislature contemplated. *Id*. at 33.

Accordingly, the PWDCRA covers only those whose disabilities are unrelated to their capacity to perform their jobs. The disabled person must be capable of performing the duties of the position. A disability that is related to one's ability to perform the duties of a particular position is not a disability within the meaning of the act. *Rymar v. Michigan Bell Tel. Co*., 190 Mich. App. 504, 506 (1991), abrogated on other grounds, *Lamoria v Health Care & Retirement Corp*, 233 Mich. App 560 (1999) (citing *Carr v. General Motors Corp.*, 425 Mich. 313, 315-316, 321-322 (1986)). An employee who is unable to report to work because of her disability is "unable to perform her job because of her [disability]." *Yeary v. Mich. Dep't of Corrections*, 1999 WL 33455077 (Mich. App. 1999) (citing *Rymar v. Michigan Bell Telephone Co.*, 190 Mich. App 504, 506 (1991); *Ashworth v Jefferson Screw Products, Inc*., 176 Mich. App 737, 743 (1989)). The foregoing cases involve employees who were unable to perform specific duties of their jobs or who were unable to return to work after a leave of absence. Similarly, although Steckloff was released to work without restriction or accommodation, she was admittedly unable to work on a regular basis because of her disability. The Michigan Court of Appeals has specifically held that a disability that "require[s] disproportionate use of sick time ... will at some point begin to affect the

employee's ability to perform the duties of a particular job or position," and that forcing the employer to let the employee take off as much time as needed was not the type of reasonable accommodation contemplated by the PWDCRA. *Rollert v. Dep't of Civil Serv.*, 228 Mich. App. 534, 540 (1998) (internal quotation marks omitted). While WSU allowed Steckloff to use old sick bank time to cover time off for her cancer treatment for some time, it was not legally obligated to do so under the PWDCRA. Rather, as WSU explained at the hearing, this was not an accommodation that allowed Steckloff to perform the material duties of her job, instead, it was merely an informal modification that also incorporated a call-in procedure. Steckloff has not cited any case suggesting that once an employer makes a change in its procedure that is not required by law, it must continue to do so *ad infinitum*. Moreover, Steckloff's need for extensive time off due to her disability does not appear to fall in the category of "restructuring jobs and altering schedules for minor and infrequent duties," nor has Steckloff argued that it does. Accordingly, WSU had no legal obligation to continue to allow Steckloff to use old sick bank time after her physician indicated that she could return to work without restriction or accommodation. Because Steckloff's disability required her to use extensive sick time, it is not a disability that is unrelated to her ability to perform her job at WSU and her PWDCRA claim must fail.

Similarly, Steckloff's attendance issues render her "unqualified" under the Rehabilitation Act.  As explained in *EEOC v. Ford*, a "reasonable accommodation" may include "job restructuring and part-time or modified work schedules" but it does include removing an "essential function" from the job because that is *per se* unreasonable.  *Id*. at 761 (citing *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 850 (6th Cir. 1998)).  Indeed, the general rule is that "an employee who cannot come to work cannot perform any of his job functions, essential or otherwise."  *Id*. (quoting *EEOC v. Yellow Freight Sys. Inc.*, 253 F.3d 943, 948 (7th Cir. 2001) (*en banc*).  Just as in *EEOC v. Ford*, regular and predictable on-site job attendance is an essential function of Steckloff's job at WSU.  There is no dispute here that according to both the job description and her own testimony, the essential job duties of the EMC position required her to be physically present on campus and routinely interact face-to-face with students. These duties included attending open house events, admitted student days, and student orientations, along with supervising the student employee campus tour guides, and personally conducting some of the campus tours herself; such tours took place nearly every day.  (ECF No. 33-1, Steckloff dep, pp. 42-46, 50; ECF No. 32-8, Ex. G, Job Description; ECF No. 32-6, Brown dep, p. 33).  Given these essential job functions that require in-person attendance, Steckloff cannot satisfy

the second element of a discrimination claim under the Rehabilitation Act claim and this claim, too, must fail.[6]

### 2.    Failure to Accommodate

As discussed above in detail, Steckloff's proposed accommodation of unlimited time off due to her disability violates the principle that the PWDCRA does not require an employer to modify primary duties as an accommodation and contradicts the teachings of *Rollert* that an employer is not required to permit an employee to have unlimited time off as an accommodation.  Steckloff also seems to suggest that she requested a work from home accommodation, which was denied.  Even if Steckloff had made such a request, she does not explain how working from home would allow her to perform all of her essential work duties, particularly those that require her to be present on-site, which are admittedly essential.  Steckloff's request also suffers from another defect.  She does not offer any evidence that she could adequately perform work from home while having the bone pain that causes her to call in to work in the first place.  *See e.g.*, *Sukari v. Akebono Brake Corp.*, 2019 WL 3456842, at *6 (E.D. Mich. July 31, 2019) (Plaintiff admitted that when she experienced a flare-up of her medical condition,

---

[6] Given that Steckloff is unable to satisfy the second element of a discrimination claim under both the PWDCRA and the Rehabilitation Act, the Court need not address her arguments that she was terminated because of her disability or that she was treated differently that non-disabled employees.  Notably, Steckloff does not identify any employees from whom she was allegedly treated differently, in any event.

which would allegedly cause her to need to work from home, she was unable to perform any of the essential functions of her job.).

Finally, Steckloff did not make a written request for accommodation in 2017, which undermines her failure to accommodate claim under the PWDCRA. *Estate of Jackson by Jackson v. 36th Dist. Court*, 2019 WL 4180178, at *5 (Mich. Ct. App. Sept. 3, 2019) ("Absent a written request for accommodation, a plaintiff alleging a failure to accommodate claim cannot prevail.") (citing *Petzold v. Borman's, Inc.*, 241 Mich. App. 707, 716 (2000). Steckloff attempts to skirt this requirement by arguing that any such request was futile. In support of her futility theory, she cites Jackson's testimony that she had told Steckloff that she did not think university policy allowed employees to work from home every day on a permanent or long term basis. (ECF No. 33-5, pp. 18-19). As far as the Court can discern, Steckloff was not ever seeking to work from home on a full-time basis, although the parameters of her request remain unclear. Jackson's testimony simply does not suggest that any request Steckloff might submit to the OEO would be futile. Nothing in this record suggests that Jackson was involved in or had any influence over the OEO process. Steckloff offers no evidence that her request "would not have been duly considered," especially since WSU has previously provided accommodations, albeit not through the OEO. *See Clark v. Whirlpool Corp.*, 109 Fed. Appx. 750, 755 (6th Cir. 2004).

Further, Steckloff's own testimony belies her argument of futility.  Steckloff repeatedly testified that she understood that if she wanted a modified work schedule or to be able to work from home, she must contact the OEO.  (ECF No. 33-1, pp. 155, 188-189, 200, 250).  She also testified that she did not need such an accommodation so long as WSU was allowing her to use to her old sick bank time.  (ECF No. 33-1, p. 155).  Even viewing in the light most favorable to Steckloff as the court does, her testimony suggests that she was not seeking work-from-home accommodation in 2017.  Accordingly, the Court finds no basis to excuse Steckloff from the PWDCRA's express requirement that a request for accommodation be made in writing.

C.   <u>PWDCRA Retaliation</u>

Steckloff claims that she was retaliated against for filing an EEOC charge.  She brings this claim under the PWDCRA only.  (ECF 1-1, Count III).  To establish a prima facie case of unlawful retaliation under the ELCRA or PWDCRA, a plaintiff must show that (1) she engaged in protected activity, (2) the activity was known by the defendant, (3) the defendant took action adverse to the plaintiff, and (4) there was a causal connection between the protected activity and adverse action.  *Aho v. Dep't of Corr.*, 263 Mich. App. 281 (2004).  A plaintiff's burden of proving causation for a PWDCRA retaliation claim is higher than for other discrimination claims.  "To establish a causal connection, a plaintiff must

demonstrate that his participation in the protected activity was a 'significant factor' in the employer's adverse employment action, not merely that there was a causal link between the two events." *Aho*, 263 Mich. App. at 289. "[M]ere discriminatory or adverse action will not suffice as evidence of retaliation unless the plaintiff demonstrates a clear nexus between such action and the protected activity." *Id*.

WSU argues that she cannot show a causal connection between her protected activity (filing the EEOC charge) and the adverse employment action (her termination). WSU argues that Steckloff cannot even show temporal proximity, which it says is insufficient by itself to establish causation. In response, Steckloff argues that she can show temporal proximity and that temporal proximity alone is sufficient. However, none of the cases cited by Steckloff address a retaliation claim brought pursuant to the PWDCRA. Steckloff further points to evidence that Dawn Medley (one of the decision-makers on her termination) treated her differently (refusing to speak to her) after she filed her EEOC charge.

The present circumstances are quite similar to those facing the Michigan Court of Appeals in *Schafer v. Mid-Michigan Orthopaedic Inst., PLLC*, 2019 WL 691697, at *7 (Mich. App. Feb. 19, 2019). In *Schafer*, in support of her causation argument, the plaintiff pointed to temporal proximity, along with a comment made by Dr. Sauchak, the individual who terminated her employment. When they were

discussing an incident in the office in which the plaintiff had raised her voice to several coworkers, the plaintiff told Dr. Sauchak that she had contacted an attorney about the harassment she was experiencing at the office due to medical leaves of absence.  Dr. Sauchak responded "I wish you hadn't done that, Lorrie."  The court concluded that this comment "does not amount to evidence upon which reasonable minds could differ as to whether plaintiff's termination was caused by her assertion of rights under the Act."  *Id*. at *7 (citing *West v. General Motors Corp.*, 469 Mich. 177, 185-187 (2003)).  The court found that this evidence, which it characterized as an "innocuous comment," did not rise above mere "conjecture and speculation" which was insufficient to create a genuine issue of material fact.  *Id*. (citing *Aho*, 263 Mich. App. at 289; *Ghaffari v. Turner Constr. Co. (On Remand)*, 268 Mich. App. 460, 464 (2005)).

Similarly, Steckloff points only to temporal proximity along with the "cold shoulder" she received from Medley after filing her EEOC charge.  Like the comment in *Schafer*, this is not sufficient evidence to create a genuine issue of material fact.  This evidence is further undermined because Medley was only one of three people involved in the decision to terminate Steckloff, in contrast to *Schafer*, where Dr. Sauchak was the sole decision-maker.  Under these

circumstances, Steckloff has failed to meet her burden of creating a genuine issue of material fact on causation.[7]

## IV.   RELIEF

For the reasons set forth above, the court **GRANTS** defendant's motion for summary judgment on all claims asserted by plaintiff.

**IT IS SO ORDERED**.

Date: June 23, 2020

s/Stephanie Dawkins Davis
Stephanie Dawkins Davis
United States District Judge

---

[7] Given the foregoing conclusion that Steckloff cannot establish causation and accordingly, WSU is entitled to summary judgment on her PWDCRA retaliation claim, the court need not address the parties' arguments regarding pretext.  Further, because WSU is entitled to summary judgment on all of Steckloff's claims, the court need not address the parties' argument regarding mitigation of damages.